OCT. TERM 1835.<br>The Mayor &c. of St. Louis v. Hempstead.<br>Cir. ct. erred in finding non est factum for deft.

————◆⁕◇————

## THE MAYOR, ALDERMEN AND CITIZENS OF THE CITY OF ST. LOUIS, v. WILLIAM HEMPSTEAD.

The authority given, by the act of the General Assembly, to the Mayor and Aldermen of St. Louis, to license, tax, and regulate by ordinance, drays &c., does not empower them to prevent *slaves* from being employed to drive such drays &c.

ERROR to St. Louis circuit court.

Opinion of the court delivered by McGirk J.

The Mayor, Aldermen and Citizens of the city of St. Louis, brought an action before the Mayor of the city of St. Louis, to recover a penalty of ten dollars, imposed on the owners of slaves, for permitting the slaves to drive and manage drays. The plaintiffs had judgment before the Mayor, the defendant appealed to the circuit court, where the defendant had judgment, to reverse which, the cause is brought here. By the 12th section of the act of 1825, (R. C. 201,) to incorporate the city of St. Louis, it is enacted, that the Mayor and Aldermen, shall have power by ordinance, to levy and collect taxes upon real and personal property within the city, not exceeding &c., to make regulations to prevent the introduction of contagious diseases, to make quarantine laws for that purpose, and enforce the same within ten miles of the city, and within the jurisdiction of the state, to make regulations to secure the general health of the inhabitants, to prevent and remove nuisances, to establish night watches and patroles, erect lamps in the streets and lighting the same, to improve and preserve the navigation of the Mississippi within the city, to erect repair & regulate public wharves and docks, to regulate the erecting and the rates at pri-

The authority given by the act of the Genl. Assembly, to the Mayor and Aldermen of St. Louis, to license, tax and regulate by ordinanse, dravs &c., does not empower them to prevent slaves from being employed to drive such drays &c.

31

vate wharves, to regulate the stationing, anchorage and mooring of vessels, to provide for licensing, taxing and regulating auctions, retailers, ordinaries, taverns, and billiard tables, hackney carriages, wagons, carts, drays, pawn brokers, venders of lottery tickets, money changers, hawkers, and pedlers, &c. &c.    On the 6th June, 1835, the Mayor and board of Aldermen passed an ordinance to license and regulate wagons, carts and drays.    The act provides that each wagon, cart, and dray, for the transportation of goods &c., for hire within the limits of the city, shall obtain a license to use the same, and shall pay for the same as a tax ten dollars; the owner shall have the same numbered and recorded.    The 8th section of the ordinance provides that, "no slave shall be permitted to drive any licensed wagon, cart or dray, or have the charge of any such wagon cart or dray, while the same is employed in the transportation of articles of any kind, within the limits of this city, for which money is paid or promised to be paid, or demanded under a penalty of ten dollars."    The dray and slave belonged to the defendant Hempstead, and were employed contrary to this ordinance.    On the part of Hempstead, it is insisted, that this ordinance goes beyond the power granted by the charter to the corporation. Mesrs. Geyer and Gamble argue, that the power to regulate drays mentioned in the charter, is a principal power, and does not draw after it the power to regulate the employment of slaves within the city.    Messrs. Spalding and Bates argue, that the power to regulate drays, gives necessarily the power to say, who may or may not be employed in driving the same.    It has also been argued by the counsel for Hempstead, that to prohibit the employment of slaves, as wagon, cart and dray drivers, is an interference with the enjoyment and use of private property, which is against the general law of the land, contrary to the uses and ends of property &c.    It may be useful to take a view of the state of the city, before this charter of incorporation was granted in 1822. It was then a commercial place of some importance, and for its business, required the employment of many carts, wagons, and drays.    Ever since the foundation of the city as a village, slavery, both in fact and law, have existed to a very considerable extent, and wherever slavery is known to exist in the United States, and wagons, carts and drays are used, those who have had the care and management of the same, either for hire, or to perform the business of the owner, have been, and still are slaves, at least to a great extent; to drive and manage wagons, carts and drays,

where slaves are, seems to be by common usage, the appropriate employment ot slaves.   In this city, slaves have been numerous, and still are so, and such was the fact when the city charter was enacted by the legislature. This state of things must have been known to the legislature, or at least, must have been known to the representatives of the county of Saint Louis.   Can 'it be believed, that with this knowledge, the legislature intended by using the words "shall have dower to license and regulate wagons, carts and drays,," to authorise the corporation to pass a law to prohibit the owners of slaves in the city, under a penalty of ten dollars, to employ them in the care and management of such carriages; nor can it be supposed, that if this hidden power had been known to exist, when the inhabitants voted to accept the charter, they would have accepted it.   It is not pretended that the regulation of slaves, is directly or expressly given by the charter of incorporation, but that it is necessarily implied in the power to regulate drays.   Surely the mode of a dray's operation may be regulated, without touching the question, whether a freeman or slave shall be driver. It is argued that this ordinance regulates the employment of slaves.   It seems to us to be so, and as has been well said by counsel, the words should be understood and limited to ordinary regulations, and when extended to regulations uncommon and extraordinary, we may well doubt whether in such case, the power exercised, is not beyond the natural capacity of the subject to yield.   We suppose ordinary regulations of a dray would be, to regulate the speed, the position of a dray when standing or loading, with a view to the ease and comfort of other drays, carriages and persons that might be passing and repassing. In such cases, there might also be other things respecting drays and drivers, which could, under the direct power given, be regulated.   It is believed to be a safe rule of construing powers, to confine resulting powers to those things, and those only, which are obviously necessary, proper, fit and apt to accomplish the express or principal power.   When that rule is applied to this case, we must ask ourselves the question, can drays be so regulated as to accomplish the use for which they are intended, without excluding slaves from being drivers.   We think this question must be considered in the affirmative.   We are of opinion that this ordinance, under the name of regulating drays, regulates slave labor, which is beyond the grant in the charter.   This court is of opinion that there is no error in the record.   The judgment of the circuit court is affirmed with costs.